**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NEWNET COMMUNICATION** | ) | |
| **TECHNOLOGIES, LLC**, a Delaware limited | ) | |
| liability company, and **NEWNET** | ) | |
| **COMMUNICATION TECHNOLOGIES,** | ) | |
| **S.a.r.l.**, a Luxembourg limited liability | ) | |
| corporation, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 8159 |
| | ) | |
| **VI E-CELL TROPICAL TELECOM, LTD.**, | ) | |
| a U.S. Virgin Islands corporation, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This diversity-of-citizenship action was brought by NewNet Communication

Technologies, LLC and NewNet Communication Technologies, S.a.r.l. (collectively "NewNet"),

charging that VI E-Cell Tropical Telecom Ltd. ("Tropical") had breached its duty under a

guaranty agreement to pay the debts of three of its subsidiary corporations in Haiti (known

collectively as "Hainet"). Tropical filed an Answer coupled with Affirmative Defenses ("ADs")

(Dkt. 47) and followed that up by filing a Counterclaim that it intends to assert against NewNet

(Dkt. 51). Now before this Court are NewNet's motions to strike or dismiss Tropical's ADs and

to dismiss Tropical's Counterclaim, along with Tropical's responses to those motions and

NewNet's replies.[1] For the reasons set out below, NewNet's motion to strike or dismiss

_____

[1] This opinion cites NewNet's and Tropical's respective submissions as "N." and "T." followed by appropriate designations: memoranda addressing NewNet's motion to strike or dismiss Tropical's ADs cited as "Mem. Str.," "Resp. Mem. Str." and "Reply Mem. Str." and

(continued)

Tropical's ADs is granted in part and denied in part, and NewNet's motion to dismiss Tropical's counterclaim is denied.

Factual Background[2]

Tropical is the majority owner of the Hainet corporations (Answer ¶ 7), which provide wireless broadband services to customers in Haiti (Am. Countercl. ¶ 7).  At some point before March 3, 2011 Hainet entered into an agreement ("Motorola Agreement") with Motorola, Inc. under which Motorola agreed to provide certain wireless broadband equipment and services to Hainet at enumerated prices (id. ¶¶ 11-12).  Among other provisions, the Motorola Agreement required the prior written consent of the other party before either party could assign it (Motorola Agmt. ¶ 18.1).

Motorola also entered into a guaranty agreement ("Guaranty") with Tropical on the same March 3, 2011 date (Answer ¶ 12).  Under the Guaranty Hainet was granted a $2 million line of credit by Motorola, in exchange for which Tropical agreed to guarantee unconditionally Hainet's "obligations" under the Motorola Agreement.  "Obligations" is a defined term in Guaranty ¶ 1:

> "Obligations" means collectively, all of the liabilities and obligations of [Hainet] to Motorola under the Agreement, whether now existing or hereafter arising, whether or not currently contemplated.

Meanwhile the Guaranty's Preliminary Statement included a definition of "the Agreement" (id. at 1):

---

(footnote continued)
memoranda speaking to NewNet's motion to dismiss Tropical's Counterclaims cited as "Mem. Dis.," "Resp. Mem. Dis." and "Reply Mem. Dis."

[2]  What follows in the text reflects Tropical's version of the relevant facts, which are taken as true for purposes of this opinion.

> Whereas, [Hainet] and Motorola entered into that certain . . . Agreement dated September 10, 2010 (as the same may be subsequently modified, amended or supplemented, together with all instruments agreements related thereto, the "Agreement").

Unlike the Motorola Agreement, the Guaranty could be assigned by Motorola without notice to or consent of Tropical (id. ¶ 11). As for choice of law and venue provisions, the Guaranty specified that Illinois law would apply in interpreting and applying the Guaranty and that any suit on the Guaranty was to be brought in the courts of Illinois or the Northern District of Illinois (id. ¶ 13).

On or about April 29, 2011 -- just a few weeks after executing the Guaranty -- Motorola assigned both the Guaranty and the Motorola Agreement to Nokia Siemens Network US, LLC ("Nokia") (Answer ¶ 16).[3] Then, in an email exchange running from August 24 to 26, 2011, personnel from Nokia's sales and commercial department told Chris Taylor (Hainet's principal) that "the current contract is closed and no longer be used [sic]" and that Nokia wanted Taylor to "acknowledge the attached T&C [terms and conditions]" in place of the Motorola Agreement (T. Resp. Mem. Dis. Ex. A at 3, Dkt. 68-1). Taylor resisted at first but ultimately agreed to "close" the Motorola Agreement and accept the new contract ("Nokia Agreement") in exchange for promises from Nokia that it would provide Hainet 60-day payment terms and a $2 million line of credit -- the same amount that Motorola had previously provided in exchange for Tropical's guaranty (id. at 1-3). Several of the terms in the Nokia Agreement were more

_____

[3] Tropical denies that Motorola assigned the Guaranty to Nokia (see Answer ¶ 16), but its ADs are effectively pleaded in the alternative to that denial -- most of them implicitly assume the Guaranty's assignment. Hence for the sake of clarity only, and not imposing a forfeiture of Tropical's denial at Answer ¶ 16, this opinion proceeds as if the assignment of the Guaranty were undisputed.

beneficial to Nokia than corresponding terms of the Motorola Agreement had been to Motorola -- to give just one example, Nokia Agreement ¶ 19 provided for arbitration of disputes in Finland and the application of Finnish law to such disputes.[4]

In November 2011 Nokia announced that it would spin off a part of its global business, including its business with Hainet, to NewNet (see T. Resp. Mem. Str. 2). Despite what has been said earlier about the email exchange between Nokia and Hainet as to canceling the Motorola Agreement, Nokia notified Hainet by a February 15, 2012 letter that it was assigning that contract to NewNet (see Notice of Assignment Ex. A (Dkt. 19-10)). But in the various schedules of contracts included in Nokia's and NewNet's assignment agreement, no mention at all was made of the Motorola Agreement, the Guaranty or any other contract or account between Nokia and either Hainet or Tropical (see Dkt. 19, Ex. F-J).

After NewNet succeeded Nokia contractually, it proved to be unable to provide the level of service that Hainet expected (Countercl. ¶¶ 17-18), a failure that caused Hainet's customers to lose cellular service for two days, among other problems (id. ¶ 20). Even worse, Hainet also had to purchase from third parties the services that NewNet had represented it would provide (id. ¶ 23). As a result Hainet suffered damages in excess of $3.5 million (id. ¶ 24).

NewNet asserts that Hainet owed it some $653,400 in unpaid invoices as of November 13, 2013 (Compl. ¶ 1). Because neither Hainet nor Tropical paid that amount in full (Answer ¶ 18), NewNet filed this action. Tropical responded by filing a motion to dismiss, which this Court denied in an oral ruling (hereafter "Oral Ruling," Feb. 21, 2014 Status Hrg. Tr. (Dkt. 23)). Tropical then filed its ADs and Counterclaim, which are the subject of this action.

_____

[4] This Court takes judicial notice that Nokia was and is one of Finland's major companies.

## Relevant Law

NewNet's motions before this Court, though legally separate, are conceptually related. NewNet's motion to strike or dismiss Tropical's manifold ADs under Fed. R. Civ. P. ("Rule") 12(f)[5] is premised mostly on the ground that Tropical's ADs are assertedly insufficient as a matter of law. And NewNet's motion to dismiss Tropical's Counterclaim under Rule 12(b)(6) asserts that Tropical has failed to state a claim on which relief can be granted. In other words, both motions essentially ask this Court to reject Tropical's assertion of various excuses for nonperformance of the Guaranty because those excuses fail as a matter of law. But because the motions are legally distinct, it is worth dwelling for a moment on the different standards that they bring into play.

Conventional wisdom teaches that motions to strike under Rule 12(f) are disfavored (see, e.g., 5C Charles Wright & Arthur Miller, Federal Practice and Procedure § 1380 (3d ed. 2004)). But where a defendant's asserted ADs are both legion and mostly frivolous, a motion to strike can aid the parties in resolving the case by removing irrelevant issues from consideration. On that score Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1294 (7th Cir. 1989) (most internal citations omitted) -- a case that continues to be relied upon extensively a quarter century later -- is worth quoting at length:

> Midwhey places great reliance on the general rule that motions to strike are disfavored. This is because motions to strike potentially serve only to delay. But where, as here, motions to strike remove unnecessary clutter from the case, they serve to expedite, not delay. Affirmative defenses will be stricken only when they are insufficient on the face of the pleadings. Ordinarily, defenses will not be

_____

[5] NewNet also moves in the alternative to dismiss Tropical's ADs 3 through 9 under Rule 12(b)(6). But as will be seen, all of those ADs either fail to pass muster under Rule 12(f) or are subject to an arbitration agreement, so that consideration of them under Rule 12(b)(6) proves unnecessary.

struck if they are sufficient as a matter of law or if they present questions of law or fact.  Affirmative defenses are pleadings and, therefore, are subject to all pleading requirements of the Federal Rules of Civil Procedure.  Thus, defenses must set forth a "short and plain statement," Fed. R. Civ. P. 8(a), of the defense.

Defenses that are more properly classified as denials, as well as defenses that are legally insufficient on their face, can both be stricken under Rule 12(f) (see id. at 1294-95; Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1057 (5th Cir. 1982)).

Meanwhile, like a complaint, a counterclaim will be dismissed under Rule 12(b)(6) only if, after taking all well-pleaded allegations as true and drawing all reasonable inferences in favor of the counterclaimant, the counterclaimant still would not be entitled to relief under any legal theory (see Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc., 250 F.3d 570, 574 (7th Cir. 2001)).  And that is not all.  As Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 934-35 (7th Cir. 2012), quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009), has explained):

> To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'. . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

As the Factual Background section recounts, several contracts are at issue in this action, and each includes a choice of law clause.  Courts typically honor such clauses absent some countervailing concern grounded in public policy (see Restatement (Second) of Conflict of Laws § 187; accord, Hussein v. L.A. Fitness Int'l, L.L.C., 2013 IL App (1st) 121426 ¶ 11, 987 N.E.2d 460, 464 (1st Dist. 2013)).  Neither party has presented such a concern.  Hence this opinion proceeds on the premise that the Guaranty must be construed in accordance with Illinois law

(Guaranty ¶ 13), the Motorola Agreement in accordance with Singaporean law (Motorola Agmt. ¶ 19.1) and the Nokia Agreement in accordance with Finnish law (Nokia Agmt. ¶ 19.1).

Both the Motorola and Nokia Agreements also provide that the interpretation of those compacts is to be conducted exclusively in an arbitral forum (Motorola Agmt. ¶ 19.4; Nokia Agmt. ¶ 19.2)[6] -- indeed, even before that provision of the Motorola Agreement kicks in, its Paragraph 19.3 requires the parties to submit their disputes to non-judicial mediation before moving to arbitration. Federal law creates a strong policy in favor of enforcing arbitration agreements as written (see generally Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)). Once a party invokes an arbitration agreement as to particular issues, and once the court is satisfied that those issues are indeed subject to the agreement to arbitrate, the court must stay proceedings at least as to those issues pending the resolution of proceedings in the arbitral forum (9 U.S.C. S 3, as applied in Volkswagen of Am., Inc. v. Sud's of Peoria, Inc., 474 F.3d 966, 971 (7th Cir. 2007)).

As for the interpretation of the Guaranty, only one thing need be said at the outset, and that is that Illinois does not apply rules of strict construction to the interpretation of guaranties. As TH Davidson & Co. v. Eidola Concrete, LLC, 2012 IL App (3d) 110641 ¶ 10, 972 N.E.2d 823, 825 (3d Dist. 2012) (citations omitted) has put it succinctly:

> A guaranty contract is construed according to the principles that govern contracts generally. If the contract's language is unambiguous, it must be enforced as written.

---

[6] Motorola Agreement ¶ 19.2 makes an exception, allowing recourse to judicial proceedings to avoid "irreparable injury." Neither party contends that the current facts present such a dire situation, so that exception to exclusive arbitration does not apply. Nokia Agreement ¶ 19.2 provides a similar exception for injunctive relief, which neither party is seeking in this action.

Thus common law principles calling for the strict interpretation of guaranties will not avail to defeat the clear intent of the parties (id.).

## Substantial Treatment of the Litigants' Positions

As has been stated, Tropical has launched a whole squadron of ADs along with a Counterclaim against NewNet, and NewNet has taken aim at the entire lot by motions to strike and dismiss. NewNet's aim is largely true, and so its motions are for the most part granted. Only Tropical's AD 2 survives -- and the ultimate success or failure of that defense, which awaits further development of the facts, seems likely to dispose of this action entirely. But before turning to AD 2 and examining why it alone is left standing, this opinion will summarize Tropical's other asserted ADs and its Counterclaim and explain why NewNet is entitled to have them stayed or dismissed. Rather than simply repeat them in the order in which Tropical has set them out, they will be organized here in a sequence easier for disposition.

### Tropical's Counterclaim and ADs 7 and 8

Tropical's Counterclaim and two of its ADs, although framed separately, really derive from a single claim against NewNet (a claim that, as will be seen, belongs to Hainet in the first instance). Tropical asserts in its Counterclaim that NewNet failed to provide certain products and services that it had represented it would deliver to Hainet, causing those companies to incur millions of dollars in reliance damages and lost profits, and that these sums are somehow recoverable by Topical as damages under theories of breach of contract, breach of warranty and negligent misrepresentation. Tropical's AD 7 simply rephrases that Counterclaim as an argument in favor of set-off, saying that Tropical should be able to offset its obligation as guarantor by the amount of Hainet's damages under the Counterclaim. And Tropical's AD 8 asserts that Tropical is not liable under the Guaranty because NewNet breached a duty of good faith and fair dealing it

owed to Hainet under the contract or contracts between them. So both of those ADs, together with the Counterclaim, actually interpose a single factual allegation against NewNet's claim on the Guaranty: NewNet violated its contract with Hainet.

As NewNet correctly points out, the problem with Tropical asserting that allegation here is that it obviously (and almost tautologically) arises from Hainet's contractual arrangement with NewNet, whether under the Motorola Agreement or under the Nokia Agreement, and disputes under both of those contracts are subject to arbitration agreements. And as the Federal Arbitration Act provides (9 U.S.C. § 3):

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Here there has been an "application of one of the parties" in the form of NewNet's motion to dismiss ADs 7 and 8 along with the Counterclaim for improper venue. Seeking to avoid that result, Tropical counters that a third and entirely separate contract governed some of Hainet's business dealings with NewNet, and that contract contained no arbitration clause. That third contract was not one explicit agreement, says Tropical, but is evidenced by representations that NewNet made to Hainet upon which the latter relied, as well as orders and invoices between those two companies -- in short, the purported third contract is an implied contract born of the parties' course of dealing (Am. Countercl. ¶¶ 10-11; T. Resp. Mem. Dis. 7).

There are two basic problems with that assertion. Taken together, they make it plain that Tropical's allegation of a claimed third contract fails for lack of plausibility.

First, the course of dealing to which Tropical refers is entirely consistent with both the Motorola and Nokia Agreements -- in fact, they explicitly contemplate that contracts of a more limited scope will be adopted without affecting their own continuing viability (see Motorola Agmt. ¶ 2.1; Nokia Agmt. Art. 2). So the fact that the parties had agreed on the provision of certain new products and services under certain new terms does nothing on its own to suggest that they intended to form a contract separate from the Motorola or Nokia Agreements.

Second and even more fundamentally, the purchase order and invoice on which Tropical relies to buttress its assertion of an _implied_ contract actually incorporate the terms of an _explicit_ contract. Both the invoice and purchase order make the disclaimer, "Current contractual Terms and Conditions apply" (T. Resp. Mem. Dis. Ex. B).[7] That disclaimer would make no sense if, as Tropical asserts, the purchase order and invoice were not subject to any explicit contract but only to the agreement implicit in the parties' course of dealing.

In other words, the very exhibit that Tropical has attached in an attempt to support its allegation that an implied contract existed actually contradicts that allegation -- and in such a case the exhibit controls (see Bogie v. Rosenberg, 705 F.3d 603, 609 (7th Cir. 2013). As for what those "contractual Terms and Conditions" might be, of course the answer can only be the Motorola Agreement or the Nokia Agreement, because (1) at least one of those contracts

_____

[7] It is proper to consider an exhibit such as this one, which was not attached to the pleading but which is unambiguously referred to in the pleading and is central to Tropical's claim for relief (see Am. Countercl. ¶ 12; Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993)). It may also be noted that any reference to a single invoice and purchase order provides not much of a foundation on which to erect an asserted major contract (Aristotle's aphorism in Nichomachea Ethics that "One swallow does not make a spring" spawned a number of copycat efforts during the ensuing two millennia, including one in Cervantes' Don Quixote) -- but even if Tropical's reference was intended to be only exemplary, what is said in the text still calls for rejection of its position on substantive grounds.

governed Nokia's relationship with Hainet and (2) Nokia assigned whatever contract it had with Hainet to NewNet (see Master Acquisition Agmt. at 5, ¶ 1.1(c) (Dkt. 20-6)).

So Hainet's claim against NewNet, and thus Tropical's Counterclaim, arise from one of two contracts, both of which provide that any claims arising from or relating to them are contractually subject to arbitration (Motorola Agmt. ¶¶ 19.2-19.4; Nokia Agmt. ¶ 19.2). Claims that are contractually subject to arbitration remain subject to arbitration when the contract is assigned (Asset Allocation & Mgmt. Co. v. W. Employers Ins. Co., 892 F.2d 566, 574-75 (7th Cir. 1989)), so that Hainet's purported assignment of its claims against NewNet does nothing to affect their arbitrability. While it will eventually fall to this Court to determine "whether the parties are bound by a given arbitration clause" (see BG Group PLC v. Republic of Argentina, 134 S. Ct. 1198, 1206 (2014)) -- that is, whether they are bound by the Motorola Agreement's arbitration clause or by the Nokia Agreement's arbitration clause instead -- it is obvious that the entirety of Hainet's claim against NewNet, which it purportedly assigned to Tropical, is subject to one or the other of the agreements to arbitrate.[8]

With all of that said, the proper course of action when issues are subject to arbitration is to stay rather than to dismiss them (see Volkswagen, 474 F.3d at 971, which holds that stays are mandatory under 9 U.S.C. § 3, and Tice v. Am. Airlines, Inc., 288 F.3d 313, 318 (7th Cir. 2002), which holds that dismissal of arbitrable issues is improper). As such, NewNet's motion to strike Tropical's ADs 7 and 8 is denied, as is its motion to dismiss Tropical's Counterclaim. Instead

_____

[8] Both agreements prohibit assignment without the other party's consent (Motorola Agmt. ¶ 18.1; Nokia Agmt. ¶ 20.4) -- but the precise import of those prohibitions, together with the effect of Hainet's attempt to assign its claims under the agreements in apparent contravention of them, is a question for the arbitrator (see Elzinga & Volkers, Inc. v. LSSC Corp., 47 F.3d 879, 882 (7th Cir. 1995)).

resolution of the issues presented by those ADs and that Counterclaim is stayed pending

arbitration. As for which arbitral forum is proper, that issue must await determination as to

which of the Agreements bound the parties when Hainet's (and thus Tropical's) claim against

NewNet arose -- a determination that, as will be seen, cannot be made without further factual

development.

**Tropical's ADs 1, 3, 4, 5 and 9**

As for the rest of Tropical's ADs (saving AD 2), they are legally insufficient on their

face. While it would be possible to postpone a decision as to those ADs until the central issue

presented by AD 2 is resolved, they so clearly lack merit that this opinion addresses them now to

assist the parties in focusing their efforts on the one question likely to be dispositive in this

action.

Tropical's AD 1 asserts that, because the Guaranty and the Motorola Agreement are held

by different NewNet entities (respectively NewNet USA and NewNet Luxembourg), the NewNet

entity holding the Guaranty has no standing to enforce it. But the Guaranty imposes no

requirement that both it and the Agreement be held by the same person -- to the contrary, the

Guaranty allows for assignment (by Motorola or its assigns) of any "right and obligations . . . or

any interest [in the Guaranty] in full, or in part" (Guaranty ¶ 11, emphasis added). Hence the

Guaranty expressly contemplates that the guaranteed party's right (to collect from the guarantor)

may be assigned separately from the guaranteed party's duties, among which its Preliminary

Statement lists "providing certain financial terms to [Hainet] upon the terms and for the purposes

specified [in the Motorola Agreement]." Such a separate assignment is precisely the

arrangement that NewNet has set up: One NewNet entity holds the Guaranty and another

NewNet entity conducts the day-to-day business with Hainet (see T. Resp. Mem. Str. 4-5). And

because the Guaranty explicitly allows one person to be assigned the right to enforce the Guaranty while another performs the Motorola Agreement, Tropical's AD 1 must be and is stricken.

Next, Tropical volunteered that it did not oppose NewNet's motion to strike AD 3 (T. Resp. Mem. Str. 11). So that AD is stricken as well.

To return to the ADs that are in dispute, Tropical's AD 4 asserts that the Guaranty fails for lack of consideration. Tropical argues that it entered into the Guaranty with Motorola in exchange for Motorola increasing Hainet's then-existing $1 million line of credit to $2 million. As Tropical tells it, because NewNet never <u>actually</u> loaned an amount in excess of $1 million to Hainet, the Guaranty as between Tropical and NewNet fails for lack of consideration.

But that wholly unrealistic contention ignores the fundamental distinction between a one-time loan and a line of credit. <u>Black's Law Dictionary</u> 1071 (10th ed. 2014) provides a straightforward definition of "line of credit":

> The maximum amount of borrowing power extended to a borrower by a given lender, to be drawn on by the borrower as needed.

In other words, a line of credit involves a promise by the lender to extend credit, up to a specified sum, in such amounts and at such times as the <u>borrower</u> chooses.

Here NewNet, as assignee of all rights and obligations under the Guaranty, was bound to perform Motorola's promise to fund a $2 million line of credit (see Master Acquisition Agmt. at 9-10, ¶ 1.3(b) (Dkt. 20-6)) -- but Hainet apparently never requested credit from NewNet in excess of $1 million. Hainet's election not to draw on the unused portion of the line of credit did nothing, of course, to release NewNet from its open-ended promise to extend credit if, as and when Hainet <u>did</u> decide to request it. To the contrary, NewNet remained bound by its promise,

and it is axiomatic that a promise is good consideration (see Restatement (Second) of Contracts §§ 71, 75). Accordingly there can be no real dispute that the Guaranty is supported by consideration, and thus Tropical's AD 4 is legally insufficient. It too is stricken.

Tropical's AD 5 reasserts an argument that it first set out in its motion to dismiss: that the Guaranty applies only to obligations owed to "Motorola," not owed to Motorola's assigns. That contention flies in the face of the unambiguous language of Guaranty ¶ 15:

> This Guaranty shall be binding upon the Guarantor and its successors and assigns, and shall inure to the benefit of Motorola and its successors and assigns.

As if that were not enough to dispatch AD 5 totally (and it is), this Court already rejected the argument in its earlier Oral Ruling, citing there the realities of the business relationship between Hainet and NewNet rather than the express terms of the Guaranty (see Oral Ruling 8:3-10:18). Hence Tropical's AD 5 is plainly insufficient legally, and this Court strikes it as well.

Because a lineup in Tropical's listing of ADs simply skipped a number 6, and because AD 2 will be dealt with in the following section, this opinion turns to Tropical's AD 9 -- the last one that it advances. There Tropical urges that Nokia's assignment of its business to NewNet altered Tropical's risk as guarantor and thus voided the Guaranty. It is true as a general principle of Illinois law (which controls that issue) that when a guarantor's risk of payment substantially increases due to a change in the underlying agreement or transaction, the guarantor can avoid the guaranty. But the problem for Tropical is that general rule does not apply in cases where the guarantor assented to the change that has assertedly altered its risk (see generally Chicago Exhibitors Corp. v. Jeepers! of Ill., Inc., 376 Ill. App. 3d 599, 609, 876 N.E.2d 129, 138 (1st Dist. 2007)). That is what Tropical has admittedly done here, first by agreeing to an absolute and unconditional guaranty in the first place (see Guaranty ¶ 6; and see Roels v. Drew Indus., Inc.,

240 Ill. App. 3d 578, 583-84, 608 N.E.2d 411, 415 (1st Dist. 1992)) and then by failing to object when given notice of Nokia's intent to assign its contracts with Hainet to NewNet (see T. Resp. Mem. Str. 3; and cf. Chicago Exhibitors, 376 Ill. App. 3d at 608-09, 876 N.E.2d at 138).

So even if Nokia's assignment of its business to NewNet did increase Tropical's rather than Hainet's risk (a proposition that this Court has previously suggested is doubtful in its Oral Ruling 4:11-4:18), there can be no possible dispute that Tropical assented to that assignment. Consequently Tropical cannot now avoid the assignment on the ground of increased risk, and AD 9 is likewise stricken.

**Tropical's AD 2**

So much for the vast majority of Tropical's defenses and its counterclaim -- all that remains is Tropical's AD 2, which alleges that Nokia "terminated" the Motorola Agreement before its assignment to NewNet. Tropical's and NewNet's back-and-forth over that defense brings this opinion to the one question properly before this Court that is likely to be dispositive: Was the alleged debt (owed by Hainet to NewNet) incurred under the Motorola Agreement or not?

That question is of such pivotal importance because by its terms the Guaranty applies only to obligations under the Motorola Agreement. Specifically, the Guaranty states that Tropical guarantees Hainet's "obligations," a term that the Guaranty expressly limits to "liabilities and obligations . . . under the [Motorola] Agreement" (Guaranty ¶ 1). In other words, if Hainet's debts to NewNet are not liabilities under the Motorola Agreement, then Tropical has no contractual obligation to pay them -- and NewNet's claim for relief must fail as a matter of

law.[9]  But if Hainet's debts to NewNet are liabilities under the Motorola Agreement, then (because all of Tropical's other ADs and its Counterclaim are dismissed or stayed, as the earlier analysis demonstrates) Tropical has no defense to payment.

So NewNet attacks that defense vigorously, both by arguing that it is really a denial rather than a defense and by asserting that it is insufficient as a matter of law anyway (N. Reply Mem. Str. 3-4).  As for that second argument, NewNet purports to raise three grounds for finding AD 2 insufficient as a matter of law:  (1) that the Nokia Agreement is only a modification, amendment or supplement to the Motorola Agreement, and the Guaranty explicitly includes such amendments and additions in its definition of the "Agreement," (2) that whatever the upshot of Nokia's and Hainet's adoption of the Nokia Agreement may be, it is implausible to conclude that they meant to cancel the Motorola Agreement entirely, because Nokia later notified Hainet that it was assigning the Motorola Agreement to NewNet, and (3) that NewNet relied upon the Guaranty in extending credit to Hainet and allowing 60-day payment terms, so that Tropical cannot now disavow it.  This opinion now addresses those contentions in turn.

First, as to the threshold question about the proper categorization of AD 2, it is unmistakably more than a simple denial that the Motorola Agreement and the Guaranty were assigned.  As clarified by the argument that Tropical advanced in its responsive memorandum, AD 2 is essentially an assertion that the Motorola Agreement was abandoned as to future transactions and that a new agreement (the Nokia Agreement) was substituted for it to govern those future transactions.  It is thus a positive statement that facts not stated in the Complaint

_____

[9]  NewNet could still collect the indebtedness of course, but it would have to collect directly from Hainet -- and its efforts at collection would be subject to one or the other of the Agreement's arbitration provisions, as set out earlier in this opinion.

render the Guaranty inapplicable to the debts still owing. That is in essence the very definition of an affirmative defense (a definition that this Court had occasion to explore at some length in <u>Bobbitt v. Victorian House, Inc.</u>, 532 F. Supp. 734, 736 (N.D. Ill. 1982)[10]).  So NewNet's first stab at the second AD misses its mark.

NewNet also seeks to fault Tropical for not setting out its defense in greater detail in its Answer, but Rule 8(c) requires a defendant merely to "affirmatively state any . . . affirmative defense."  To say that the Motorola Agreement was terminated before assignment meets that low bar.  But even if AD 2 is treated as a "pleading that states a claim for relief" within the meaning of Rule 8(a),[11] it need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief" (Rule 8(a)(2)). And Tropical's statement that the Motorola Agreement was "terminated" before the assignment to NewNet would suffice for that modest purpose.  There is plainly no reason to strike AD 2 on the ground that it is not specific enough.

What has been said to this point dispatches NewNet's more formalistic objections to AD 2, but there is also no ground for ruling at this point that AD 2 is <u>legally</u> insufficient.  On that

---

[10]  It is worth noting that <u>Bobbitt</u> is not really subject to this Court's regular comment, made whenever counsel seek to rely on a District Court opinion (whether issued by this Court or by any other District Judge), that we are regularly (and quite properly) reminded by our Court of Appeals that such opinions have no precedential force.  By contrast, our Court of Appeals' opinion in the <u>Heller</u> case, relied upon both earlier and later in this opinion, continues to be treated by that Court as a (perhaps the) leading authority for the propositions that it announced as to ADs a quarter century ago (but see n.11 to this opinion), and <u>Heller</u> cited <u>Bobbitt</u> twice in reaching its result.

[11]  <u>Heller</u>, 883 F.2d at 1294 stated that Rule 8(a) applies to affirmative defenses.  But <u>Heller</u> was decided before <u>Iqbal</u> announced the plausibility requirement inherent in Rule 8(a), and it has not been decided at the federal appellate level whether such a plausibility requirement is also inherent in Rule 8(c) (see generally William Janssen, <u>The Odd State of Twiqbal Plausibility in Pleading Affirmative Defenses</u>, 70 Wash. & Lee L. Rev. 1573 (2013), which collects and analyzes over 100 district court cases addressing the question).

score NewNet makes colorable arguments as to why it should ultimately prevail in this action, but none of them suffices to show that the AD fails to raise a material question of law or fact, the prerequisite to granting a motion to strike a defense as legally insufficient (see <u>Heller</u>, 883 F.2d at 1294).

First, contrary to NewNet's contention, the fact that the Guaranty allows for amendments and additions to the Motorola Agreement does not in itself entitle NewNet to have Tropical's AD 2 stricken. It is true of course that the Guaranty covers all "obligations" under the "Agreement" and that the Guaranty does define the "Agreement . . . as the same may be subsequently modified, amended or supplemented, together with all instruments and agreements related thereto" (Guaranty at 1). But AD 2 plainly does <u>not</u> assert that the Motorola Agreement was "modified, amended or supplemented." It rather asserts that the Motorola Agreement was "terminated" -- effectively that it was abandoned, with a new and comprehensive contract (the Nokia Agreement) adopted to govern all future transactions. If the parties had wished the Guaranty to apply to such a <u>substitute</u> contract -- as opposed to a modification, amendment or supplement -- they could have so specified. They did not.[12]

What has just been said in the text and in n.12 should not be mistaken as a ruling at this point. NewNet will be free of course to argue that Hainet and Nokia intended the Nokia

_____

[12] NewNet does not argue that the Nokia Agreement was an "instrument [or] agreement related" to the Motorola Agreement, nor could it. If "related" were read as broadly as it would have to be to incorporate the Nokia Agreement, the contract would be a general guaranty of all debts owed by Hainet to Motorola. That is because <u>any</u> contract for the sale of broadband or wireless equipment and services (Hainet's entire line of business) would be "related to" the Motorola Agreement under such a reading. It would rather appear likely that the "related" language in the Motorola Agreement might refer to such documents as invoices for particular sales, price schedules and the like, and not to separately negotiated comprehensive contracts that cover the same subject matter.

Agreement only to modify or supplement (not to replace entirely) the Motorola Agreement. But the content of the pleadings and the agreements to which they refer -- the Nokia Agreement, the agreement between Hainet and Nokia to "close" the Motorola Agreement -- do support an inference that Hainet and Nokia agreed to do away with the Motorola Agreement entirely. If they did, Tropical's AD 2 would have real traction.

NewNet argues next, however, that it would be implausible for Nokia to assign an agreement that it had already terminated (N. Mem. Str. 2 n.1), effectively arguing that Nokia's assignment of the Motorola Agreement to NewNet conclusively shows that the contract was still in effect as to future transactions. There are two problems that again prevent dismissal at this pleading stage. First, it is not in fact undisputed that Nokia intended to assign the Motorola Agreement to NewNet as part of the sale of its Haiti business -- neither the Motorola Agreement nor the Guaranty is included in the extensive schedules that set out the contracts that Nokia assigned to NewNet. One possible plausible inference from that omission is that Nokia understood the Guaranty and the Motorola Agreement to have no future effect. Second, any agreement between Nokia and Hainet to abandon the Motorola Agreement for all orders in the future would likely have no effect on any still-outstanding debt originally incurred under the Motorola Agreement -- that indebtedness would continue to be an obligation under that contract and thus also subject to the Guaranty. And it would be more than plausible for Nokia to assign to NewNet any contracts that governed at least <u>some</u> of Hainet's outstanding balance with Nokia, even if they did not govern all of it.

Finally, NewNet takes a last shot at dismissal of AD 2 by arguing (1) that NewNet would never have extended a line of credit and 60-day payment terms to Hainet were it not for the Guaranty and (2) that Tropical must be bound by the Guaranty because Hainet consequently

enjoyed those benefits. That is at root an equitable argument along the lines of reliance and promissory estoppel (Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 233 Ill. 2d 46, 51, 906 N.E.2d 520, 523-24 (2009) adopts Restatement (Second) of Contracts § 90 and hold promissory estoppel is not only an affirmative defense but is also a cause of action in itself).[13]

Now, if Hainet and Nokia intended only to modify or supplement the Motorola Agreement (meaning the Guaranty would still apply), the fact of NewNet's reliance on a guaranty of payment would then be beside the mark or simply confirmatory, for Guaranty ¶ 4 waives any requirement that the guaranteed party show reliance. But if Hainet and Nokia intended to revoke the Motorola Agreement entirely (so that the Guaranty would not apply of its own force), NewNet could still compel performance of the Guaranty if it could show that Tropical (or perhaps Hainet) made a promise that it knew or reasonably should have known would induce NewNet's reliance (see Restatement (Second) of Contracts § 90).[14] And because both NewNet's reliance and Tropical's or Hainet's knowledge are issues of fact, it would be inappropriate for this opinion to resolve them as a matter of law at this stage of the litigation.

In sum, the parties dispute (1) whether Nokia and Hainet intended to modify or instead to abandon the Motorola Agreement, (2) what inferences should be drawn as to the continuing

_____

[13] To the extent that NewNet is simply invoking the concerns that led this Court to reject Tropical's earlier motion to dismiss -- specifically the fact that Hainet continued to do the same general type of business with NewNet that it had with Nokia -- those concerns carry far less weight now that Tropical has come forward with evidence showing an express agreement no longer to abide by the Motorola Agreement and to substitute in its stead the Nokia Agreement.

[14] Because NewNet also seeks specific performance of the Guaranty rather than a legal remedy, it would also need to show why expectation damages (here the difference between the prices it charged Hainet and the prices it would have charged Hainet without a guaranty of payment) would be inadequate (see, e.g., Stevens v. Protectoseal Co., 27 Ill. App. 3d 724, 729-30, 327 N.E.2d 427, 431-32 (1st Dist. 1975); Restatement (Second) of Contracts § 359(1)).

viability of the Motorola Agreement from Nokia's assignment of contracts to NewNet and

(3) whether, if the Motorola Agreement was indeed abandoned, NewNet could still enforce the

Guaranty under the principles of equity. Those questions -- along with the questions as to what

law should apply in answering them -- prevent this Court from now granting NewNet's motion to

strike Tropical's AD 2.

## Conclusion

For the foregoing reasons, NewNet's motion to strike or dismiss Tropical's ADs is

granted in part and denied in part. NewNet's motion to dismiss Tropical's Counterclaim is

denied -- instead that claim is stayed pending arbitration. All parties are ordered to appear for a

status conference at 9 a.m. on April 9, 2015.

_____
Milton I. Shadur
Senior United States District Judge

Date: March 30, 2015